1
2
3
4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

5

6

ABDERRAHIM BELQASIM,

7

Petitioner,

8

v.

9

DREW BOSTOCK, et al.,

10

Respondent.

Case No. 2:25-cv-01282-LK-TLF

REPORT AND
RECOMMENDATION

Noted for November 12, 2025

11     Petitioner Abderrahim Belqasim, a native, and citizen of Morocco, is currently

12 detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE

13 Processing Center ("NWIPC") in Tacoma, Washington. Dkt. 1 (Petition). He has been

14 detained since on or about September 15, 2024. Dkt. 3 at ¶ 1 (Decl. of Abderrahim

15 Belqasim); Dkt. 10 at 4-5 (Decl. of Robert Andron); Dkt. 12-1 at 2 ("Record of

16 Deportable/Inadmissible Alien").

17     On July 8, 2025, he filed a petition for writ of habeas corpus under 28 U.S.C. §

18 2241, through counsel, arguing his continued detention under 8 U.S.C. § 1225(b)

19 violates his due process rights under the Fifth Amendment to the United States

20 Constitution. *Id.*

21     Petitioner seeks an order from the Court: (1) directing his release unless the

22 Government holds a custody hearing for petitioner before an immigration judge in

23 petitioner's native language and dialect within 14 days; (2) directing that at the hearing

24 the Government must establish by clear and convincing evidence that petitioner

25

REPORT AND RECOMMENDATION - 1

presents a risk of flight or danger and that no alternative to detention can mitigate any risk that his release would present; and (3) directing that if the Government cannot meet its burden, the immigration judge must order petitioner's release on appropriate conditions of supervision, taking into account his ability to pay a bond. *Id.* at 18.

The Government has filed a return memorandum and motion to dismiss arguing petitioner's detention is lawful under 8 U.S.C. § 1225(b) and the Due Process Clause of the Fifth Amendment. Dkt. 8. Petitioner, represented by counsel, has filed a response to the motion and the Government has filed a reply. Dkts. 13, 16.

Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that the motion to dismiss (Dkt. 8) be DENIED as improper and that the petition (Dkt. 1) be GRANTED as provided below.

BACKGROUND

Petitioner is a native and citizen of Morocco who entered the United States at an unknown location on or about September 15, 2024, and was apprehended shortly after entering the United States without inspection on September 15, 2024. Dkt. 3 at ¶ 1 (Belqasim Decl.); Dkt. 10 at ¶ 4-5 (Andron Decl.); Dkt. 12-1 at 2 ("Record of Deportable/Inadmissible Alien"). Petitioner asserts he came to the United States because he was afraid of returning to Morocco, where he was previously targeted and harassed for his sexual orientation. Dkt. 3 at ¶ 1 (Belqasim Decl.). Petitioner states, and the Government does not appear to significantly dispute, that he speaks a language known as Tachelhit, that he does not speak Moroccan Arabic known as Darija, that he speaks limited English that he has learned in detention but cannot read or write in English and is not comfortable proceeding in court in English. *Id.* ¶ 2.

1    On September 16, 2024, petitioner was initially issued an expedited removal

2    order under 8 U.S.C. § 1225(b)(1). Dkt. 1 at ¶ 21; Dkt. 12-2 at 2 ("Notice and Order of

3    Expedited Removal"). Prior to being transferred to the NWIPC, the Government

4    represents that petitioner was detained at the Adams County Detention Center where

5    he was held from on or about September or October 2024 until February 2025 when he

6    was transferred to the NWIPC. Dkt. 3 at ¶ 3 (Belqasim Decl.)[1]; Dkt. 10 at ¶¶ 5-7.

7        Petitioner states, and apparently the Government does not dispute, that he was

8    called in for a credible fear interview on October 31, 2024; he could not complete the

9    interview because there was no Tachelhit interpreter, and he was unable to understand

10   the Moroccan Darija interpreter. *Id*. Petitioner states that, since his credible fear

11   interview, he consistently told the Government he speaks Tachelhit. Dkt. 3 at ¶ 3

12   (Belqasim Decl.).

13       Petitioner also states, and the Government does not dispute, that in the region of

14   Morocco where he is from, there are many dialects of Tamazight, one of which is

15   Tachelhit. *Id*. ¶ 5. He states that the different tribes and villages all speak different

16   dialects and although the villages are close by, they cannot understand each other. *Id*.

17   He states that even Tachelhit has different variations. *Id.*

18

19

20   [1] The Court notes that there appears to be some discrepancy regarding where petitioner was
21   detained prior to being transferred to NWIPC. The Adams County Detention Center appears to
     be located in Mississippi but petitioner asserts he was initially detained in Mississippi for two
     weeks and then transferred to a detention center in Nevada where he remained from October
22   2024 to February 2025 when he was transferred to NWIPC. Dkt. 3 at ¶ 3 (Belqasim Decl.); *see*
     Adams County Correctional Center | ICE. The Court notes that the record reflects that petitioner
23   attended several court dates in Las Vegas immigration court which would tend to support
     petitioner's assertion. But because this discrepancy is not relevant to the resolution of the
24   petition, the Court need not resolve it here but simply notes it for the record.

25

Petitioner was served with a Notice to Appear ("NTA") on or about November 1, 2024, telling him that he was removable under the Immigration and Nationality Act ("INA") §§ 212(a)(6)(A)(i) and 212(a)(7)(A)(i) (codified at 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1182(a)(7)(A)(i)) as an alien who has not been admitted or paroled, and as an alien without valid documents under the INA. Dkt. 10 at ¶ 5 (Andron Decl.); Dkt. 12-3 at 2 ("Notice to Appear").

The NTA reflects that petitioner's expedited removal order was vacated under 8 C.F.R. § 208.30[2] and that he was placed into full removal proceedings. Dkt. 12-3 at 2 ("Notice to Appear"). The NTA also states that "the language [petitioner] understands is Tachelhit." *Id.*

Petitioner appeared in the Las Vegas Immigration Court on November 14, 2024, for an initial master calendar hearing ("MCH"). Dkt. 11 at ¶ 4 (Decl. of Omar Carbahal). The Immigration Judge ("IJ") reset the hearing on the grounds that a telephonic interpreter was not available. *Id.*

On November 21, 2024, the Las Vegas Immigration Court held a reset MCH. *Id.* ¶ 5. The IJ stated on the record that the immigration court has been unable to find an

---

[2] Title 8 of the Code of Federal Regulations § 208.30(b) provides:

> If an alien subject to section 235(a)(2) or 235(b)(1) of the Act indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by a USCIS asylum officer in accordance with this section. A USCIS asylum officer shall then screen the alien for a credible fear of persecution or torture. An asylum officer, as defined in section 235(b)(1)(E) of the Act, has the authorities described in § 208.9(c). If in exercising USCIS's discretion, it is determined that circumstances so warrant, the asylum officer, after supervisory concurrence, may refer the alien for proceedings under section 240 of the Act [codified at 8 U.S.C. § 1229a "Removal Proceedings"] without making a credible fear determination.

1   interpreter in the Moroccan Arabic language. *Id.* The immigration court tried to

2   communicate with petitioner through a Hassaniya language interpreter but was

3   unsuccessful. *Id.* The IJ stated that the U.S. Department of Homeland Security would

4   investigate further whether a language could be identified. *Id.* The hearing was reset to

5   December 5, 2024. *Id.*

6         On December 5, 2024, the Las Vegas Immigration Court held another reset

7   MCH. *Id.* ¶ 6. The IJ stated that the Court was unable to communicate with petitioner

8   and the Court would attempt to find an interpreter in the Tachelhit language, which

9   appeared to be petitioner's best language. *Id.* The immigration court reset the hearing to

10   December 19, 2024. *Id.*

11         The scheduled December 19, 2024, hearing was reset to January 6, 2025, due to

12   IJ leave. *Id.* ¶ 7.

13         On January 6, 2025, the Las Vegas Immigration Court held another reset MCH.

14   *Id.* ¶ 8. The IJ ordered an interpreter for the Tamasheq language through two telephonic

15   interpreter services. *Id.* Neither telephonic interpreter service had a qualified Tamasheq

16   language interpreter available. *Id.* The hearing was reset to January 13, 2025, to give

17   more time to find a qualified interpreter. *Id.*

18         On January 13, 2025, the Las Vegas Immigration Court held another reset MCH.

19   *Id.* ¶ 9. Before the hearing, the immigration court tried to communicate with petitioner

20   using several staff interpreters, including an interpreter for the Hassaniya language and

21   an interpreter for the Moroccan Arabic language. *Id.* Petitioner was not able to

22   understand any of them. *Id.*

23

24

25

1    The IJ stated on the record that the immigration court had received an email

2  stating that the contractor did not have a Tamasheq interpreter available, but he would

3  try the telephonic interpreter service numbers to see if one was available. *Id.* The IJ

4  ordered an interpreter for the Tamasheq language through two telephonic interpreter

5  services. *Id.* Neither telephonic interpreter service had a qualified Tamasheq language

6  interpreter available. *Id.* One service communicated that they were sourcing for a

7  Tamasheq language interpreter. *Id.* The hearing was reset to January 27, 2025. *Id.*

8    On January 27, 2025, the Las Vegas Immigration Court again held a reset MCH.

9  *Id.* ¶ 10. A contractor interpreter appeared. *Id.*

10    The immigration court asked petitioner through the interpreter what was his best

11  language. *Id.* Petitioner stated that he spoke Tachelhit. *Id.* The interpreter was not able

12  to communicate with him. *Id.* The hearing was reset to February 25, 2025, to try to find

13  a Techelhit interpreter. *Id.*

14    On February 25, 2025, the Tacoma Immigration Court held a reset MCH. *Id.* ¶

15  11. The immigration court tried three different telephonic interpreter services, but no

16  certified interpreter for Tachelhit was available. *Id.* The hearing was reset to March 20,

17  2025. *Id.*

18    On March 20, 2025, the Tacoma Immigration Court reset the case without a

19  hearing to April 4, 2025, because it determined that no telephonic interpreter was

20  available. *Id.* ¶ 14.

21    On April 4, 2025, the Tacoma Immigration Court again held a reset MCH where a

22  Tachelhit interpreter appeared. *Id.* ¶ 15. Petitioner confirmed that his best language was

23  Tachelhit. *Id.* The IJ tried to swear in petitioner through the Tachelhit interpreter, but

24

25

REPORT AND RECOMMENDATION - 6

petitioner said he spoke a different dialect of Tachelhit and did not understand the interpreter. *Id.*

The interpreter was speaking a northern dialect while petitioner spoke a dialect from the Atlas/Toubkal mountains. *Id.* According to the Government, the interpreter said he could understand petitioner and the difference was not a big one. *Id.* The hearing was reset to May 1, 2025, to give time to locate a certified interpreter in the Tachelhit language with a dialect from the Atlas/Toubkal mountains. *Id.*

On May 1, 2025, the Tacoma Immigration Court held a group reset MCH. *Id.* ¶ 16. The court spent 40 minutes on the phone with an interpreter in the Tamasheq language trying to discern the proper language. *Id.* Petitioner did not understand the interpreter. *Id.* They determined that petitioner spoke the Tachelhit language with a dialect from the Atlas/Toubkal mountains. *Id.* The IJ reset the hearing to June 2, 2025. *Id.*

On May 12, 2025, an IJ from Santa Ana, California appeared via Webex in the Tacoma Immigration Court for a reset master calendar hearing. *Id.* ¶ 17. A telephonic Moroccan Arabic interpreter appeared. *Id.* Petitioner responded in a language that was not Moroccan Arabic and said he did not understand Moroccan Arabic. *Id.* The interpreter determined that the respondent spoke Berber/Tachelhit. *Id.* The IJ changed the language to Berber, ordered a Berber interpreter, and reset the hearing for June 2, 2025. *Id.*

On June 2, 2025, a Berber/Tachelhit interpreter appeared. *Id.* ¶ 18. The interpreter confirmed that Berber/Tachelhit is the language spoken in the region where

1    the petitioner was born. *Id*. The interpreter was able to communicate with petitioner. *Id*.

2    The hearing was reset to allow petitioner to seek representation. *Id*.

3          On June 23, 2025, counsel from the Northwest Immigration Rights Project

4    ("NWIRP") met with petitioner for a pro-bono consultation. Dkt. 15 at ¶ 2 (Decl. of Laura

5    Reist). Petitioner informed counsel that his I-589 (Application for Asylum and for

6    Withholding of Removal) was due at his MCH the next day, on June 24, 2025. *Id*.

7    *Because of* his rare language, counsel was unable to get a Tachelhit interpreter on-

8    demand. *Id*. Counsel wrote petitioner a letter to show the IJ that NWIRP would assist

9    him with his I-589 application once they were able to schedule an interpreter. *Id*.

10   Petitioner presented this letter at his MCH on June 23, 2025, and the case was reset to

11   July 9, 2025. *Id*.

12         On July 2, 2025, counsel assisted petitioner to fill out his I-589 application with a

13   telephonic Tachelhit interpreter. *Id*. ¶ 3. On July 3, 2025, counsel filed petitioner's

14   application via courier with her E61- Notice of Entry of Limited Appearance for

15   Document Assistance Before the Immigration Court. *Id*. The filing was delivered on July

16   7, 2025. *Id*.

17         On July 4, 2025, the One Big Beautiful Bill Act went into effect, requiring a new,

18   $100 filing fee for I-589 applications. *Id*. ¶ 4.

19         Petitioner's July 9, 2025, MCH was reset to July 14, 2025. *Id*. ¶ 5. At petitioner's

20   MCH on July 14, 2025, he was told he needed to pay the $100 asylum filing fee. *Id*. The

21   IJ advised petitioner to ask NWIRP for help. *Id*. He was informed he needed to pay the

22   fee by his next hearing, which was reset to August 8, 2025. *Id*.

23

24

25

1    After July 14, 2025, petitioner contacted NWIRP for assistance with his filing fee

2    and NWIRP approved a fee advancement. *Id.* ¶ 6. Counsel looked online on the USCIS

3    website, fee schedule, and pre-order instructions to try to find how or where to pay the

4    defensive I-589 filing fee and could not find any instructions. *Id.*

5    Counsel tried searching pay.gov and could not find the I-589 application. *Id.*

6    Other NWIRP staff repeatedly called the Tacoma Immigration Court to ask for guidance

7    as to how or where to pay the fee and were told that there is no guidance or current

8    system in place to pay the filing fee. *Id.*

9    On August 1, 2025, counsel wrote petitioner a letter to provide to the court at his

10   next MCH to show that NWIRP will pay his $100 filing fee as soon as a payment system

11   is operationalized. *Id.* ¶ 7.

12   At his MCH on August 8, 2025, the Tacoma Immigration Court accepted the

13   letter and reset petitioner for another MCH on September 15, 2025. *Id.* ¶ 8. Also on

14   August 8, the Court gave petitioner a printout of the "USCIS Immigrant Fee Payment

15   Guide." *Id.* Counsel went on the USCIS website to try to follow the instructions but was

16   unable to pay the fee there as the instructions are not applicable to petitioner — he

17   does not have a visa or Department of State Case ID, and thus counsel, could not get

18   past Step 2. *Id.*

19   At his MCH on September 15, 2025, the IJ gave petitioner another continuance

20   to pay the I-589 filing fee. *Id.* ¶ 9. Counsel states that she learned the IJ asked the DHS

21   attorney if his agency had fixed this yet, and the attorney said no. *Id.* Petitioner's next

22   hearing was scheduled for September 30. *Id.*

23

24

25

REPORT AND RECOMMENDATION - 9

On September 23, the Executive Office for Immigration Review ("EOIR") updated its payment portal to accept payment for defensive I-589s. *Id.* ¶ 10. Counsel submitted payment for petitioner's initial filing fee that same day. *Id.*

DISCUSSION

A.    Motion to Dismiss

The Government filed a return, but also labeled it a motion to dismiss. Dkt. 8. The Ninth Circuit allows a motion to dismiss in habeas corpus cases under Rule 4 of the Rules Governing Section 2254 Cases under limited circumstances. *See Niess v. Bludworth*, 114 F.4th 1038, 1044 (9th Cir. 2024) (quoting *Gutierrez v. Griggs,* 695 F.2d 1195, 1198 (9th Cir. 1983)). Rule 4 of the Rules Governing Section 2254 Cases is applied only if the petition should be summarily dismissed because on its face the claims are subject to a procedural default or are untimely; all claims are unexhausted; the claims in the petition clearly fail to state a cognizable claim for relief because they are vague, patently frivolous or false, palpably incredible, conclusory; or on the face of the petition the court can "plainly *see* that the petition lacks merit as a matter of law". *Id.*; *Valdez v. Montgomery*, 918 F.3d 687, 693 (9th Cir. 2019) (petition properly dismissed under Rule 4 because on the face of the petition and based on exhibits provided by the petitioner, the Court determined the petition was untimely); *Obremski v. Maass,* 915 F.2d 418, 420 (9th Cir. 1990) (the Court may allow the respondent to make a motion to dismiss under limited circumstances such as failure to exhaust state remedies, but not if the Court is deciding the petition on the merits); *see also,* Rule 1 of the Rules Governing Section 2254 Cases, providing that these rules apply to habeas corpus petitions filed under 28 U.S.C. § 2241.

1    Because the respondent did not argue lack of exhaustion, procedural defects,

2    that the claims are not cognizable, or that on the face of the petition the claims are so

3    meritless the petition should be dismissed as a matter of law, the Court should hold the

4    motion to dismiss is not appropriate in this case.

5    B.    Statutory Basis for Petitioner's Detention

6    Title 8 of the United States Code §§ 1225, 1226, and 1231 govern immigration

7    detention. "Where an alien falls within this statutory scheme can affect whether his

8    detention is mandatory or discretionary, as well as the kind of review process available

9    to him if he wishes to contest the necessity of his detention." *Prieto-Romero v. Clark*,

10   534 F.3d 1053, 1057 (9th Cir. 2008).

11   The parties agree petitioner is detained under § 1225(b). Section 1225 applies to

12   "applicants for admission"—noncitizens[3] who "arrive[ ] in the United States," or are

13   "present" in the United States but have "not been admitted." 8 U.S.C. § 1225(a)(1).

14   Applicants for admission fall into two categories, those covered by § 1225(b)(1) and

15   those covered by § 1225(b)(2). *See Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).

16   Section 1225(b)(1), applies to, among others, noncitizens initially determined to be

17   inadmissible because of fraud, misrepresentation, or lack of valid documentation. *Id.*

18   (citing § 1225(b)(1)(A)(i)). Section 1225(b)(2) is broader and "serves as the catchall

19   provision that applies to all applicants for admission not covered by § 1225(b)(1)" (with

20   specific exceptions that neither party argues are applicable here). *Jennings*, 583 U.S. at

21   287-88 (citing §§1225(b)(2)(A), (B)).

22

23   _____

[3] The Court uses the term "noncitizen" as equivalent to the term "alien" that is used in the
24   statute. *See Nasrallah v. Barr,* 590 U.S. 573, 578 n.2 (2020) (citing 8 U.S.C. § 1101(a)(3)).

25

"Normally, noncitizens covered by § 1225(b)(1) are subject to an expedited removal process that does not include a hearing before an Immigration Judge or review of the removal order." *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1116 (W.D. Wash. 2019) (citing 8 U.S.C. § 1225(b)(1)(A)(i)). But, where a noncitizen "indicates either an intention to apply for asylum ... or a fear of persecution," the inspecting immigration officer must refer that noncitizen for an interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30(d). Thereafter, if the asylum officer determines that the noncitizen has a credible fear of persecution, then the noncitizen "shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii); *Banda*, 385 F. Supp. 3d at 1112.

Under § 1225(b), "the only opportunity for a noncitizen to be released pending a decision on the asylum application is temporary parole 'for urgent humanitarian reasons or significant public benefit.'" *Banda*, 385 F. Supp. 3d at 1112 (quoting 8 U.S.C. § 1182(d)(5)(A)); *see also* 8 C.F.R. §§ 212.5(b), 235.3. And the "statute does not impose 'any limit on the length of detention' pending a decision on the asylum application and does not authorize bond hearings or release on bond." *Banda*, 385 F. Supp. 3d at 1112 (quoting *Jennings*, 583 U.S. at 296-301). As the Supreme Court in *Jennings*, held "1225(b)(1) mandates detention 'for further consideration of the application for asylum,' § 1225(b)(1)(B)(ii), and § 1225(b)(2) requires detention 'for a [removal] proceeding,' § 1225(b)(2)(A). The plain meaning of those phrases is that detention must continue until immigration officers have finished 'consider [ing]' the application for asylum, § 1225(b)(1)(B)(ii), or until removal proceedings have concluded, § 1225(b)(2)(A)." *Jennings*, 583 U.S. at 299.

1    Here, the parties appear to agree that petitioner is detained under § 1225(b) and

2    that the statute itself does not require or provide a right to a bond hearing.

3    C.    Due Process/The *Banda* Test

4    The right to be free from physical restraint by the Government is "at the heart of

5    the liberty that [the Due Process Clause of the Fifth Amendment] protects". *Zadvydas v.*

6    *Davis*, 533 U.S. 678, 690 (2001). Confinement under this immigration statutory

7    framework applies broadly; it is not limited to "a small segment of particularly dangerous

8    individuals" *Id.* at 691 (quoting *Kansas v. Hendricks,* 521 U.S. 346, 356 (1997)). The

9    procedural protection from unwarranted detention is an administrative proceeding,

10    followed by judicial review. *Id.* at 692.

11    Even if the statutory terms of § 1225(b) do not require a bond hearing,

12    petitioner's continued detention must still comport with due process. *See Boumediene v.*

13    *Bush*, 553 U.S. 723, 797 (2008) (holding that habeas corpus applies to detainees who

14    were classified as enemy combatants and held at Guantanamo Bay; "few exercises of

15    judicial power are as legitimate or necessary as the responsibility to hear challenges to

16    the authority of the Executive to imprison a person."); *Wing Wong v. United States*, 163

17    U.S. 228, 235-237 (1896) (under the Due Process Clause of the Fifth Amendment,

18    temporary confinement is permissible for a noncitizen pending deportation but –

19    compulsory labor, confiscation of property, or other punitive measures are not).

20    Neither the Supreme Court nor the Ninth Circuit have settled on a test for

21    assessing the constitutionality of prolonged mandatory detention. *Banda*, 385 F. Supp.

22    3d at 1113.

23

24

25

REPORT AND RECOMMENDATION - 13

1    The Court in *Banda,* as discussed below, applied a multi-factor analysis, and

2    declined to apply the test of *Mathews v. Eldridge,* 424 U.S. 319, 334 (1976) to

3    determine whether prolonged detention without a bond hearing, for a case where the

4    noncitizen is held under § 1225(b), violates procedural due process. *Banda,* at 1106.

5    The issue here, different from the question in *Mathews,* is "the more fundamental issue

6    of whether any procedure – such as a bond hearing – must be provided." *Id.* at 1106-

7    1107.

8    This district has held that "unreasonably prolonged detention under § 1225(b)

9    without a bond hearing violates due process." *Banda*, 385 F. Supp. 3d at 1106, 1117.

10   This analysis requires consideration of the following factors: "(1) the total length of

11   detention to date; (2) the likely duration of future detention; (3) the conditions of

12   detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in

13   the removal proceedings caused by the government; and (6) the likelihood that the

14   removal proceedings will result in a final order of removal." *Id.* at 1106 (quoting *Jamal A.*

15   *v. Whitaker*, 358 F. Supp. 3d 853, 858-59 (D. Minn. 2019)). Where due process requires

16   a bond hearing, the Government must provide clear and convincing evidence to justify

17   the noncitizen's continued detention. *Id.* at 1107.

18   The parties agree the *Banda* analysis applies here. Dkts. 1, 8, 13 at 4. The Court

19   should apply the *Banda* analysis to determine whether petitioner's continued detention

20   without a bond hearing comports with due process.

21       a.  Length of Detention

22   Under the *Banda* analysis, the length of detention is "the most important factor."

23   *Id.* at 1118. Petitioner has been in custody for over 12 months. The Court should hold

24

25

REPORT AND RECOMMENDATION - 14

that this factor favors petitioner. *See Banda*, 385 F. Supp. 3d at 1118 (finding this factor

favored petitioner and granting bond hearing after 17 months detention under § 1225(b)

and collecting cases granting bond hearings after nine, ten, sixteen, and nineteen

months detention); *Cardozo v. Bostock*, No. 2:25-CV-00871-TMC, 2025 WL 2592275,

at *1 (W.D. Wash. Sept. 8, 2025) (finding this factor favored petitioner and granting

bond hearing after 10 months detention under § 1225(b)).

   b.  Likely Duration of Future Detention

       The second factor requires consideration of "how long the detention is likely to

continue absent judicial intervention; in other words, the 'anticipated duration of all

removal proceedings—including administrative and judicial appeals.'" *Banda*, 385 F.

Supp. 3d at 1119 (quoting *Jamal A.*, 358 F. Supp. 3d at 859).

       Here, petitioner was only just recently – after approximately 12 months in

detention -- able to file his I-589 Application for Asylum and for Withholding of Removal.

Thus, with many re-set hearings and no access to an interpreter for several months,

having been detained for more than 12 months, petitioner's case is only at the very

beginning stage.

       Petitioner represents that he likely faces another two to three months of detention

while the immigration court adjudicates his claim; even assuming for purposes of this

analysis that he does not prevail before an IJ, he may appeal his case as of right to the

Board of Immigration Appeals ("BIA") and subsequently to the Ninth Circuit. Dkt. 13 at

6-7 (Petitioner's Traverse).

       Petitioner submits evidence that the average processing time for a detainee's

appeal to the BIA during the period from January 1, 2024, to May 31, 2025, was 190

1   days. Dkt. 14-1 (Response from EOIR to FOIA Request Showing BIA Processing Times

2   for January 1, 2024, to May 31, 2025). And, according to the Ninth Circuit's public

3   website, it takes approximately 6 to 12 months from the date of the notice of appeal to

4   oral argument and, following argument, most cases take three months to a year for the

5   Court of Appeals to decide the case. *See* U.S. Court of Appeals for the Ninth Circuit,

6   Frequently Asked Questions, www.ca9.uscourts.gov/content/faq.php (last accessed

7   October 23, 2025).

8         The Government argues this factor should be neutral because the likely duration

9   of future proceedings is too speculative given that petitioner's removal proceedings

10   have effectively just started. Dkt. 8 at 6.

11         While the Court cannot definitively determine the duration of petitioner's future

12   detention, based on the current record, it appears likely petitioner will face many more

13   months and potentially years in detention. *Barraza v. ICE Field Off. Dir.*, No. C23-1271-

14   BHS-MLP, 2023 WL 9600946, at *6 (W.D. Wash. Dec. 8, 2023), *report and*

15   *recommendation adopted sub nom. Barraza v. United States Immigr. & Customs Enf't*

16   *Field Off. Dir.*, No. C23-1271 BHS, 2024 WL 518945 (W.D. Wash. Feb. 9, 2024)

17   (cleaned up) (citing the Ninth Circuit website's timeline for appeals and noting that under

18   this timeline a petitioner who filed his petition for review with the Ninth Circuit a few

19   months prior could be facing two years or more of additional time in custody); *Banda*,

20   385 F. Supp. 3d at 1119 (finding this factor weighed in petitioner's favor where petitioner

21   who had "only recently" appealed the IJ's denial of his case to the BIA faced a process

22   that could "take up to two years or longer"); *Hong v. Mayorkas*, 2:20-cv-1784-RAJ-TLF,

23   2021 WL 8016749, at *4 (W.D. Wash., June 8, 2021) (finding this factor favored

24

25

petitioner where he faced "an additional 15 to 38 months" in detention because he was at the "earliest stages" of pursuing a petition for review before the Court of Appeals).

The Court should find this factor favors petitioner.

   c.  Conditions of Detention

Third, the Court considers the conditions of detention. "'The more that the conditions under which the noncitizen is being held resemble penal confinement, the stronger the argument that he is entitled to a bond hearing.'" *Barraza*, 2023 WL 9600946, at *6 (quoting *Jamal A.*, 358 F. Supp. 3d at 860). "A claim for punitive detention requires a comparison of the conditions under which civil and criminal detainees 'are held.'" *Ibarra-Perez v. Howard*, 468 F. Supp. 3d 1156, 1173 (D. Ariz. 2020) (citation omitted).

Petitioner is detained at NWIPC. Petitioner contends that the conditions at the NWIPC are similar to penal confinement. Dkt. 1 at 12 (Petition). Petitioner submits evidence that he is confined inside a restrictive setting where he has faced bulling and harassment from staff and other detainees, and barriers to obtaining medical care. *Id.*; Dkt. 3 at ¶ ¶ 6-11.

He indicates he feels sad and depressed and has met with a therapist but that medical staff have been unable to obtain an interpreter to allow him to communicate fully with a therapist. *Id.* He also reports that medical staff have been unable to obtain an appropriate interpreter and that he is unable to adequately explain his concerns to obtain appropriate treatment. *Id.*

He also reports he cannot talk to his family because he does not have money to pay for calls and that he has only been allowed to go outside four to five times during

1   the several months he has been detained at NWIPC. *Id.* Petitioner also notes that

2   "reports by independent outside entities have similarly documented problems with food,

3   medical neglect, cleanliness, and other issues at NWIPC." Dkt. 1 at 12-3 (Petition, citing

4   Univ. of Wash. Ctr. for Hum. Rts., Conditions at the Northwest Detention Center

5   https://jsis.washington.edu/humanrights/projects/human-rights-at-home/conditions-at-

6   the-northwest-detention-center/). Petitioner also cites to a recent case *Cardozo v.*

7   *Bostock*, where this Court found petitioners adequately demonstrated the conditions at

8   NWIPC were similar to a criminal jail or prison based on declarations of similarly

9   situated individuals facing lengthy detention at NWIPC due to language access issues

10  who also attested to limited outdoor time, overcrowding, and poor food quality. *Cardozo*

11  *v. Bostock*, No. 2:25-CV-00871-TMC-BAT, 2025 WL 2597521, at *6 (W.D. Wash. July

12  29, 2025), *report and recommendation adopted in part, rejected in part*, No. 2:25-CV-

13  00871-TMC, 2025 WL 2592275 (W.D. Wash. Sept. 8, 2025).

14       The Government asserts that petitioner fails to provide specific information

15  regarding purported bullying and harassment and disputes petitioner's assertions that

16  he has not been provided adequate medical care. Dkt. 8 at 6. The Government submits

17  a declaration from Eddie Wang, M.D., the clinic director at NWIPC who states that

18  medical staff worked with a Tachelhit interpreter on one occasion, but that petitioner

19  indicated he could not understand the interpreter. Dkt. 9 at ¶ 6 (Decl. of Eddie Wang,

20  M.D.). Dr. Wang states that subsequent care has proceeded using either English or

21  Arabic "with teach-back to confirm understanding" and that petitioner was able to

22  successfully communicate his needs and understanding with medical or behavioral

23

24

25

REPORT AND RECOMMENDATION - 18

1  health staff. *Id.* He further states that staff have ordered medical treatment to meet

2  petitioner's clinical need. *Id.*

3         The Government does not directly dispute petitioner's assertion that the

4  conditions of detention at NWIPC are similar to those in many prisons and jails. Nor

5  does the Government refute petitioner's assertion that he has only been permitted

6  outside on a few occasions over several months at NWIPC.

7         The Court should hold, based on the evidence presented, that the conditions of

8  detention at NWIPC are similar to penal confinement, and that this factor weighs in

9  petitioner's favor.

10         d.  Delays in Removal Proceedings

11         The fourth and fifth factors consider the nature and extent of any delays in the

12  removal proceedings caused by petitioner and the Government, respectively. "Petitioner

13  is entitled to raise legitimate defenses to removal ... and such challenges to his removal

14  cannot undermine his claim that detention has become unreasonable." *Martinez v.*

15  *Clark*, No. 18-1669, 2019 WL 5968089, at *10 (W.D. Wash. May 23, 2019), *R & R*

16  *adopted*, 2019 WL 5962685 (W.D. Wash. Nov. 13, 2019) (citations and internal

17  quotation marks omitted).

18         Yet Courts should be "sensitive to the possibility that dilatory tactics by the

19  removable [noncitizen] may serve not only to put off the final day of deportation, but also

20  to compel a determination that the [noncitizen] must be released because of the length

21  of his incarceration." *Id.* (citations and internal quotation marks omitted).

22         With respect to the Government, "[i]f immigration officials have caused delay, it

23  weighs in favor of finding continued detention unreasonable.... Continued detention will

24

25

1    also appear more unreasonable when the delay in the proceedings was caused by the

2    immigration court or other non-ICE government officials." *Sajous v. Decker*, No. 18-

3    2447, 2018 WL 2357266, at *11 (S.D.N.Y. May 23, 2018). Delays in obtaining the

4    proper interpreter for petitioner have been found to be attributable to the Government.

5    *See Banda*, 385 F. Supp. 3d at 1120 ("In this case, essentially all the delay between

6    petitioner's first master calendar hearing . . . and his merits hearing . . . was caused by

7    the lack of an appropriate interpreter or DHS's request for a continuance."); *Cardozo*,

8    2025 WL 2592275, at *1 (same).

9         The record shows that petitioner has not caused any delays that should be

10   attributable to him. Rather, the record shows that once the Government obtained a

11   proper interpreter for petitioner, he immediately reached out to counsel and worked

12   diligently with counsel to file his I-589 application and pay the filing fee. Dkt. 15 at ¶ 2

13   (Reist Decl.).

14        The record shows the delays in this case are due to the Government's failure to

15   locate a proper interpreter for petitioner and to provide a mechanism for petitioner to

16   pay the required filing fee. The record shows that the Government was on notice that

17   petitioner spoke Tachelhit at a minimum back on November 1, 2025, yet there were

18   numerous subsequent appearances where the immigration court continued to provide

19   interpreters for languages petitioner did not speak. Dkt. 12-3 at 2 ("Notice to Appear");

20   Dkt. 11 at ¶¶ 4-18 (Carbahal Decl.).

21        Even when the immigration court appeared to confirm that petitioner spoke a

22   specific dialect or sub-category of Tachelhit language at some of his court appearances,

23   at subsequent appearances it continued to provide the incorrect interpreter. Dkt. 11 at

24

25

1    ¶¶ 4-18 (Carbahal Decl.). Delay in paying the filing fee for the I-589 application is

2    attributable to the Government as the  petitioner asserts, he tried to access a payment

3    system but there was no system in place for paying the newly required filing fee. Dkt. 15

4    at ¶¶  6-10 (Reist Decl.). The Government does not dispute this.

5        Even if "not the result of intentional action on behalf of government officials,

6    th[ese] delay[s] [are] attributable to the Government." *Martinez*, 2019 WL 5968089, at

7    *10 (citing *Sajous*, 2018 WL 2357266, at *11 ("the operative question should be whether

8    the [noncitizen] has been the cause of the delayed immigration proceeding and, where

9    the fault is attributable to some entity other than the [noncitizen], the factor will weigh in

10   favor of concluding that continued detention without a bond hearing is unreasonable");

11   *Dukuray v. Decker*, No. 18-2898, 2018 WL 5292130, at *4 (S.D.N.Y. Oct. 25, 2018)

12   (weighing delay caused by immigration court in favor of the petitioner)).

13        The Court should hold that the fourth and fifth factors favor petitioner.

14     e.  Likelihood of Final Order of Removal

15        The final factor involves consideration of "'the likelihood that the final proceedings

16   will culminate in a final order of removal.'" *Banda*, 385 F. Supp. 3d at 1120 (quoting

17   *Jamal A.*, 358 F. Supp. 3d at 860). The Court should find this sixth factor to be neutral. It

18   is too early to assess this factor, because the merits of the asylum application have not

19   yet been addressed and petitioner and Government assert this factor should be neutral

20   given the early stages of petitioner's proceedings.

21        In sum, the Court should find that five of the six factors weigh in favor of granting

22   petitioner a bond hearing, and one of the factors is neutral. Accordingly, the Court

23

24

25

1  should find petitioner's detention has become unreasonably prolonged and that due

2  process requires he be granted a bond hearing.

3       Petitioner also argues the Court should specifically find § 1225(b)

4  unconstitutional as applied to the facts of this case. The Hon. Tiffany M. Cartwright

5  recently addressed this same argument in *Cardozo v. Bostock*, No. 2:25-CV-00871-

6  TMC, 2025 WL 2592275, at *1 (W.D. Wash. Sept. 8, 2025). Judge Cartwright found:

7      Petitioner is detained under the mandatory detention provisions of 8 U.S.C. §
       1225(b). The statute itself does not include "a limit on prolonged detention or a

8      requirement of individual bond hearings." *Rodriguez v. Marin*, 909 F.3d 252, 255
       (9th Cir. 2018) (citing *Jennings v. Rodriguez*, 583 U.S. 281 (2018)). But through

9      *Banda*, courts in this district joined "the vast majority of other district courts to
       conclude that unreasonably prolonged detention under § 1225(b) without a bond

10     hearing violates due process." 385 F. Supp. 3d at 1117. Application of the *Banda*
       factors is thus used to determine when detention has become unconstitutionally

11     prolonged; if a detainee is entitled to a bond hearing under *Banda*, it is because
       his continued detention without one—as the text of Section 1225(b) allows—

12     violates due process. The conclusion of the R&R that Petitioner Khadaj must
       receive a bond hearing (a conclusion to which Respondents did not object)

13     requires a conclusion that Section 1225(b) is unconstitutional as applied to the
       facts of his case.

14 *Id.*

15      The Court should follow Judge Cartwright's reasoning and hold that Section

16 1225(b) is unconstitutional as applied to the facts of this case.

17 D.    Bond Hearing

18      When the Court has determined that a detainee has been subjected to

19 mandatory detention under § 1225(b) for an unreasonably prolonged period in violation

20 of due process, the proper remedy is a bond hearing; under *Singh v. Holder*, 638 F.3d

21 1196 (9th Cir. 2011) the government bears the burden of proving the detainee is a

22 danger or flight risk by clear and convincing evidence. *See, e.g.*, *Banda*, 385 F. Supp.

23 3d at 1120; *Cardozo*, 2025 WL 2592275, at *2-3; *Rahman v. Garland*, No. 2:24-CV-

24 02132-JHC-TLF, 2025 WL 1920341, at *4 (W.D. Wash. June 26, 2025), *report and*

25

1  *recommendation adopted sub nom. Anisur R. v. Garland*, No. 2:24-CV-02132-JHC-TLF,

2  2025 WL 1919252 (W.D. Wash. July 11, 2025).

3        The Court should find petitioner is entitled to a bond hearing with the procedural

4  requirements of *Singh*: there must be a contemporaneous record of the hearing, and the

5  Government bears the burden of proving by clear and convincing evidence that

6  petitioner is a flight risk or danger to the community. *Singh*, 638 F.3d 1196.

7        Petitioner also argues that the immigration judge must consider ability to pay

8  bond, and whether there are appropriate conditions of supervision that could mitigate

9  any risk of danger or flight that his release would present. Dkt. 1 at 18. Regardless of

10  whether the Government meets its burden of proof to show dangerousness or risk of

11  flight by clear and convincing evidence, petitioner has a due process liberty interest in

12  showing (and the IJ considering) whether, if he were allowed bond, he could afford it

13  and whether there are conditions of release that would mitigate any danger and allow

14  the immigration authorities to monitor him and assure his appearance for future actions

15  of the Immigration Court. *See Black v. Decker*, 103 F.4th 133, 145-159 (2d Cir. 2024)[4]

16  (upholding a district court decision requiring the immigration court to consider ability to

17  pay, and potential conditions of release that would ensure his appearance, when setting

18  a bond amount); *Cantor v. Freden*, 761 F. Supp. 3d 630, 638-640 (W.D.N.Y. 2025)

19  (holding that in determining whether petitioner poses a flight risk, the IJ must consider

20

21  ───────────────────────

22  [4] The First, Second, and Third Circuits have held that a bond hearing is required when
mandatory detention under § 1226(c) becomes unreasonably prolonged so as to violate due
process. *Black v. Decker*, 103 F.4th 133, 145-159 (2d Cir. 2024); *Reid v. Donelan*, 17 F. 4th 1, 7
(1st Cir. 2021); *German Santos v. Warden Pike County Corr. Facility*, 965 F.3d 203, 212-214
23  (3d Cir. 2020). The Eighth Circuit has determined that there is no due process violation when
detention under § 1226(c) is prolonged if immigration proceedings are ongoing. *Banyee v.*
24  *Garland*, 115 F.4th 928, 931-934 (8th Cir. 2024).

25

REPORT AND RECOMMENDATION - 23

1   whether that risk may be mitigated by reasonable conditions of supervision or monetary

2   bond and in determining whether petitioner poses a danger to the community, the IJ

3   also must consider whether that danger may be mitigated by reasonable alternatives to

4   detention); *but see, Ashmuke v. ICE Field Office Director,* No. C23-1592-RSL, 2024 WL

5   4436949 (WD Wash. October 7, 2024) at *5 (finding *Singh* "does not require the [IJ in

6   conducting a bond hearing] to consider less restrictive alternative to detention in these

7   circumstances").

8        In the context of a bond hearing under 8 U.S.C. § 1226(c), when the immigration

9   court is determining whether the noncitizen is a danger to the community, the Ninth

10  Circuit has held that conditions and alternatives to detention need not be considered.

11  *Martinez*, 124 F.4th at 786. But petitioner in this case is not subject to that portion of the

12  immigration detention statutes, because there is no evidence petitioner has been

13  charged with or convicted of a crime.

14       Here, petitioner has not received *any* bond hearing since he was originally taken

15  into custody in September 2024, and there has been no assessment of dangerousness,

16  or risk of flight. And there is no final removal order, so 8 U.S.C. § 1231 does not apply.

17  *See Zadvydas,* 533 U.S. 678, 688-689. Petitioner's indefinite detention is not authorized

18  by the immigration statutes; his detention has been of uncertain duration, no endpoint

19  has yet been identified or estimated. *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1081-

20  1082 (9th Cir. 2006) (for individual detained nearly five years under 8 U.S.C.

21  1225(b)(1)(B)(ii) and (b)(2)(A), if removal is not reasonably foreseeable, and length of

22  detention is unreasonable, habeas corpus should be granted and the noncitizen is

23  entitled to immediate release); *see also, Juan Carlos Bethancourt Soto v. Luis Soto,* No.

24

25

REPORT AND RECOMMENDATION - 24

25-cv-16200, 2025 WL 2976572 (D. N.J. October 22, 2025) (holding that detention under §1225(b)(2)(A) was unconstitutional as applied under the Due Process Clause of the Fifth Amendment, granting habeas corpus and immediate release). The Government has acknowledged the likely duration of future proceedings is too speculative given that petitioner's removal proceedings have effectively just started. Dkt. 8 at 6.

If a non-citizen has been "determined not to be a danger to the community, and not to be so great a flight risk as to require detention without bond", due process requires the immigration court to consider financial circumstances regarding ability to afford to pay bail, and alternative conditions of release. *Hernandez v. Sessions*, 872 F.3d 976, 991-994 (9th Cir. 2017). Detention would not be reasonably related to the purpose of assuring safety of the community and addressing risk of flight, if the government has produced insufficient evidence that petitioner is a risk of flight or danger to the community. *See Foucha v. Louisiana*, 504 U.S. 71, 78 (1992) (A person found not guilty by reason of insanity cannot be detained involuntarily unless the government proves by clear and convincing evidence, they are mentally ill and dangerous. "Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed."); *O'Connor v. Donaldson*, 422 U.S. 563, 574-575 (1975) (Under substantive due process analysis, even though plaintiff did not challenge the basis for his initial involuntary civil commitment, plaintiff had not been found dangerous to self or others and there was no longer any constitutional basis for depriving him of liberty).

1      In *Cantor v. Freden*, 761 F. Supp. 3d 630, 638-640 (W.D.N.Y. 2025), the Court

2   held that due process requires the bond hearing for a noncitizen who has been

3   subjected to prolonged immigration detention must include an assessment of ability to

4   pay bond, and whether there are conditions that would ameliorate dangerousness or

5   risk of flight.

6      In another recent decision, the Court in *Abduraimov v. Andrews*, No. 1:25-CV-

7   00843-EPG-HC, 2025 WL 2912307, at *10 (E.D. Cal. Oct. 14, 2025) recently

8   considered the requirements of a bond hearing under § 1225(b). The U.S. District Court

9   in that case held

10          In the event Petitioner is determined not to be a danger to the community
11      and not to be so great a flight risk as to require detention without bond, the IJ
        should consider Petitioner's financial circumstances or alternative conditions of
        release. *See Hernandez*, 872 F.3d at 1000 ("Plaintiffs are likely to succeed on
12      their challenge under the Due Process Clause to the government's policy of
        allowing ICE and IJs to set immigration bond amounts without considering the
13      detainees' financial circumstances or alternative conditions of release."); *Black*,
        103 F.4th at 138 (The district court "correctly directed the immigration judge ('IJ'),
        in setting his bond and establishing appropriate terms for his potential release, to
14      consider his ability to pay and alternative means of assuring appearance.").

15   *Abduraimov*, 2025 WL 2912307, at *10.

16      The Court should hold that at the bond hearing the Government bears the burden

17   of proving dangerousness or flight risk by clear and convincing evidence; and that

18   petitioner, during the bond hearing, shall be allowed to present evidence that he has

19   financial hardship causing lack of ability to pay for posting bond; and that there are

20   conditions of release that would allow the Immigration Court to reasonably monitor him

21   in the community to ensure his appearance at future hearings and mitigate any potential

22   dangerousness. *Cantor*, 761 F. Supp. 3d 630, 638-640; *M.P.L. v. Arteta,* No. 25-CV-

23   5307 (VSB)(SDA), 2025 WL 2938993 (S.D.N.Y. October 16, 2025) at *5-*7. The only

24

25

REPORT AND RECOMMENDATION - 26

1    Due Process protections afforded to an individual who is subject to involuntary civil

2    detention for immigration purposes are administrative procedures followed by judicial

3    review. *Zadvydas*, 533 U.S. 678, 691-694. Punitive measures cannot be imposed

4    unless a person is charged with and convicted of a crime or charged with violating

5    conditions of supervision. *Id.* at 694.

6           In the Immigration Court hearing and on habeas corpus review, ability to afford a

7    bond, and whether there are conditions of release that would assure the Immigration

8    Court of future appearance and mitigate any potential dangerousness, are relevant to

9    the due process inquiry in petitioner's case, because it is evidence that reduces the risk

10   of erroneous deprivation of liberty and punitive detention. This is an important

11   procedural safeguard in a case such as petitioner's; he has been in custody since

12   September 2024 with language barriers and lack of access to a qualified interpreter,

13   and there is no evidence of criminal history, as opposed to cases where 8 U.S.C. §

14   1226(c) applies, as in *Martinez v. Clark,* 124 F.4th 775, 786 (9th Cir. 2024). "The choice

15   is not between imprisonment . . . and living at large. . . . [i]t is between imprisonment

16   and supervision under release conditions that may not be violated." *Zadvydas*, 533 U.S.

17   678, 676. The petitioner should be allowed to present evidence regarding proposed

18   conditions for supervised release in the community and that posting bond would be

19   financially infeasible. *See M.P.L. v. Arteta,* No. 25-CV-5307 (VSB)(SDA), 2025 WL

20   2938993 (S.D.N.Y. October 16, 2025) at *5-*7 (analyzing the due process protections

21   and why a finding of non-dangerousness should not be a prerequisite to consideration

22   of ability to pay and possible conditions of release).

23                                        **CONCLUSION**

24

25

REPORT AND RECOMMENDATION - 27

For these reasons, the Court recommends that the Government's motion to dismiss (Dkt. 8) should be DENIED as improper and that petitioner's federal habeas petition (Dkt. 1) should be GRANTED as provided below. The Court should hold petitioner's ongoing and prolonged detention under 8 U.S.C. § 1225(b) without an individualized bond hearing violates the Due Process Clause of the Fifth Amendment to the United States Constitution. The Court should direct the Government to:

A.   Hold a bond hearing **to occur within 7 calendar days** of an order that adopts this Report and Recommendation.

    1.   The bond hearing shall comport with the procedural requirements of *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011) – there must be a contemporaneous record of the hearing, and the Government bears the burden of proving by clear and convincing evidence that petitioner is a flight risk or danger to the community;

    2.   The IJ shall allow petitioner to present evidence of financial circumstances or alternative conditions of release that would mitigate any potential dangerousness or risk of flight;

    3.   Or, in the alternative, the Government shall immediately release petitioner under appropriate conditions of release.

A proposed order and judgment accompany this report and recommendation.

The parties have **14 days** from service of this Report and Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can

result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474

U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations

omitted). Accommodating the above time limit, the Clerk shall set this matter for

consideration on **November 12, 2025**, as noted in the caption.

      Dated this 28th day of October, 2025.

Theresa L. Fricke
United States Magistrate Judge